### HANNA v. ROUTZAHN, Collector of Internal Revenue.

### BROWN v. SAME.

### BROOKS v. SAME.
#### Nos. 18121–18123.

District Court, N. D. Ohio, E. D.
June 12, 1936.

Thos. F. Veach and Earl W. LeFever, of Belden, Young & Veach, all of Cleveland, Ohio, for plaintiffs.

Leon F. Cooper, from the Attorney General's Office, of Washington, D. C., and E. L. Foote, Asst. U. S. Atty., of Cleveland, Ohio, for defendant.

WEST, District Judge.

These are actions to recover income taxes, in which jury trials were waived and the cases consolidated. Section 23, Revenue Act 1928 (26 U.S.C.A. § 23 and note) is involved. Article 174, Reg. 74, reads as follows: "If the stock of a corporation becomes worthless, its cost or other basis determined under section 113 may be deducted by the owner in the taxable year in which the stock became worthless, provided a satisfactory showing of its worthlessness be made, as in the case of bad debts."

From 1921 to 1928 the plaintiff Hanna purchased stock in the American Cuptor Corporation for which he paid $66,172, and which he sold in 1931 for $15, the expenses of sale greatly exceeding this sum. In 1928 the plaintiff Brown bought 300 shares of the same stock for $4,500, while Mrs. Brooks purchased 500 shares for $7,500, and this stock these plaintiffs held during 1929.

The cases turn upon the occurrence of the identifiable event by which plaintiffs' losses from these investments were evidenced. It is apparent that the stock became worthless at least as early as 1929, the year for which plaintiffs claim the right of deduction. It further appears that in fact the stock had little if any actual value at any time, especially after April 7, 1927, when the Cuptor Corporation gave the Greist Manufacturing Company a lien on most of its tangible assets to secure a debt of $41,560.46. But plaintiffs evidently had faith in the enterprise after that date, for Mr. Hanna increased his investment and the others bought their entire holdings after this lien was contracted for.

■ The law controlling this court is found in the following from Gowen v. Commissioner, 65 F.(2d) 923, 924 (C.C.A. 6): "Losses are deductible from income for those years only in which the losses are sustained. In order that a loss arising from investment in the capital stock of a corporation may be regarded as 'sustained' in any given year, it is ordinarily necessary either that there be a final disposition of the investment, as by sale or exchange, or that there be some 'identifiable event' by which the loss is otherwise clearly evidenced. Howard v. Com'r, 56 F.(2d) 781 (C.C.A. 6); Com'r v. R. J. Darnell, Inc., 60 F.(2d) 82 (C.C.A.6); Com'r v. Cleveland Trinidad Paving Co., 62 F.(2d) 85 (C. C.A. 6). It is also true that instances may arise in which the value of the shares held has 'become finally extinct' and in which the taxpayer is justified in claiming deduction [Royal Packing Co. v. Commissioner, 22 F.(2d) 536 (C.C.A.9); De Loss v. Com'r, 28 F.(2d) 803 (C.C.A. 2)]; but we are of the opinion that the taxpayer is not required to ascertain at his peril the year in which such value may become extinct, provided the stock is still held and there may be some future value, and provided further that there is an absence of an identifiable event which has been brought to the taxpayer's knowledge and which clearly evidences the destruction, either then or theretofore, of value. On the other hand, where that event happens, as in bankruptcy, voluntary liquidation, actual cessation in the conduct of the business, or the like, and all reasonable hope and expectation of even a partial return of capital is gone, the taxpayer should not be permitted to delay taking the deduction simply because it is more advantageous to him to take it in a later, rather than the earlier, year."

■ After execution of the contract mentioned, and of the chattel mortgages called for in that contract, the Cuptor Corporation's financial situation was extremely unsatisfactory. But whether the then owners of its stock were justified in believing that there was a possible future for their investment, or were required by identifiable facts and events of which they should have known, to regard the stock as without any value, depends on many factors including the nature of the business itself.

Without going into detail, the company's enterprise was of the most hazardous nature; the stockholders regarded it as an experiment, a gamble. It was doubtful whether the drinking cups could be manufactured and sold at a profit, and no one could be assured on that point until after the expenditure of much time and money. Mr. Greist's company was a stock-

holder, and he testified very fully. In part he said:

"I interviewed nearly all of those stockholders before we started any dealing with the Cuptor Corporation at all * * * and every one of them said to us that they knew it was an experiment, they did not know whether it could be made to succeed or not.

"Q. That is back in those earlier years? A. Yes, and all the way through. That is the reason why additional capital was put in from time to time. * * *

"Q. If there had only been $5,000 put in in one of these years you would not have considered that anything which would give you much encouragement, would you? A. No, but you will find that there were substantially larger amounts than that put in.

"Q. Suppose there was $100,000 put into the company, would that make any difference in your feeling in the matter? A. Why, yes, of course it would; because it would be enough to keep the thing alive and give it that further opportunity of establishing a market. This proposition is totally different from an ordinary merchandising proposition * * * because the goods which were being manufactured and to be sold were a mechanical specialty the like of which had never existed before. Therefore the market had to be created, and to create a market for a thing of that kind requires a long period of experimentation and development work and sales effort. Even on the sales end they had to try out various different methods to find out what was the best way of marketing the device.

"Q. All that you say was true in each of these years? A. Yes.

"Q. Including these earlier years? A. Yes.

"Q. It applies with equal force to all years? A. No question about it. I interviewed those various stockholders before we went into the proposition at all, and they all told me that they realized the money they had put into it was a gamble, but they were all wealthy men and they all stood ready to put in additional capital as the development of the proposition required it. That was the foundation on which we were justified in doing business with it. Then when it became evident in 1929 that there was no more capital to be put in, that definitely set up a situation on which we had to come to the conclusion that there was no value left."

When the drinking cup idea blew up, those in charge of the company brought forward the plan of the "Oasis" soft drink vending machine in which the drinking cup would be employed, and hoped that this would solve the difficulty. That these hopes persisted from 1927 on until 1929 is proven by the new money that was then put into the business. Stockholders old and new did not merely lend to the company, they bought and paid cash for its capital stock in very large sums. The investment of Mr. L. C. Hanna, one of the witnesses, seems to have been of about a quarter of a million dollars; and it is stipulated that during the first eight months of 1929, $108,450 of new money went into the Cuptor Corporation's stock. It is easy to see now that the stockholders' hopes were ill-founded; but to say judicially that the contract of 1927 and its lien for $41,000 to a friendly creditor constituted the required identifiable event definitely showing the worthlessness of their stock is another matter. Having in mind the frequent instances of industrial success which have followed upon similar long chances taken by inventors, promoters, and capitalists, this court cannot so find. Mr. Greist's attitude and belief shown in the quotation and other parts of his extensive testimony were no doubt those of other stockholders and were fairly justified under all the circumstances.

In the Royal Packing Co. Case, supra, 22 F.(2d) 536, at page 538, the court say: "The taxpayer was not entitled to the deduction merely because the stock may have subsequently become worthless or because, in the light only of subsequent developments, it may appear to have been inherently worthless during the year in question." In Lewellyn v. Electric Reduction Co., 275 U.S. 243, 247, 48 S.Ct. 63, 72 L.Ed. 262, it is said in effect that if the present solvency and future success of a business depends on the probable accuracy of the taxpayer's prophecy of future events, he cannot claim to have suffered a loss until the future fails to justify his hopes.

I think it is apparent that the government's contention that the investments of plaintiffs in the Cuptor Corporation stock became worthless in 1927, and for that reason were not deductible for the year 1929, cannot be correct.

Coming to 1929 and without going into detail, it appears to the court that the evidence very clearly proves identifiable events of that year by which the worthlessness of the stock was evidenced.

However precarious the company's financial situation, it had always been able to obtain capital with which to proceed by the sale of its stock. Up to then it had not been demonstrated that the "Oasis" machine could not be made and disposed of at a profit. The witness Greist, who was a stockholder, as well as a large creditor through his company, had not abandoned hope of ultimate success.

And it was no doubt this hope that prompted L. C. Hanna and Harvey Brown to put up over $100,000 for additional stock in 1929. When certain arrangements with the United Grape Juice Company fell through in October of that year, these gentlemen refused to have anything further to do with the project. The sudden drying up of the sole source of further capital brought matters to a focus. On October 28, 1929, the Cuptor Corporation's directors passed a resolution as follows: "Resolved, That American Cuptor Corporation has not sufficient working capital to longer continue the conduct of its business in a normal way, and meet current and past obligations; and it is further Resolved, That this board is not able to devise or recommend any means of securing additional capital with which to carry on the business of the company." The president of the company announced that this action meant an equity receivership. Certain judgments were taken against the company but not executed, evidently because no substantial amount of property could be reached, it being practically all covered by chattel mortgages; the company was unable to meet its pay roll, and one of the stockholders loaned it $2,950 for that purpose. A few days later a creditors' committee was appointed to try to work out a liquidation of the company's debts and thus avoid receivership. The resignation of the president, who was evidently thought to be largely responsible for the situation, and the appointment of the company's Philadelphia agent as vice president to have charge of the company's affairs under the supervision of the creditors' committee, soon followed.

Before the year closed the committee decided upon a plan which naturally required a little time to be put in effect and was not made effective until in January, 1930. It was notified to the stockholders by letter of December 10, 1929, which opens: "The American Cuptor Corporation can not meet its obligations because it has no working capital to enable it to continue in business." Under the plan a new corporation was to be organized with capital furnished by creditors of the old, for the purpose of so handling the assets as to realize the largest possible amount for the benefit of creditors. The new company was merely an instrument for liquidating the old. While this letter speaks of the business being continued, it is clear that there was no thought that the American Cuptor Corporation would continue the business for which it was formed, and the court finds that it ceased to do business during the year 1929.

I think this series of events, and others which can be gleaned from the record, are quite sufficient to show that the claim of the plaintiffs that the Cuptor Corporation's stock became worthless during the year 1929, is correct.

When one of the plaintiffs, I believe it was Mr. Hanna, filed his first claim for refund, the government asserted that his loss occurred in 1931. It is true that in August of that year the directors of the Cuptor Corporation passed a resolution which recited some of the prior events in the company's history, among others the formation of the new corporation, Cup and Drink Vending Machine Co., Inc., and its efforts to liquidate the Cuptor assets, with the statement that it appeared that the avails would be insufficient to pay creditors of the Cuptor Corporation in full, and that in the opinion of the board "the stock of the American Cuptor Corporation is of no value whatsoever."

This is an important item of evidence touching the matter in issue, but it is not at all conclusive as to the date when the company's stock became worthless.

At the close of 1929 there was not the remotest possibility that the operations of the new corporation would result in paying off the debts of the old, or could by any stretch of imagination result in giving the slightest value to the Cuptor Corporation's stock.

The government insists in its brief and oral argument that in 1930 the prospects of the Cuptor Corporation were brighter than for some years previous, but this is not borne out by the record. While its books showed net sales of a little over $22,000, the operating loss was something over $20,000. When we consider that the only business it was doing was incidental to liquidation, there is no justification for the view that, as its losses for the preceding year 1929 were over $88,000, the affairs of

this bankrupt enterprise were improving. The next year with net sales of $812, its operating loss was $19,639. The situation was one in which improvement was impossible and not expected or hoped for. The new corporation had a net operating income of over $7,000 in 1930, but in 1931 sustained a net loss. But the profit was forced and resulted from the fact that it took over assets of the old corporation at figures greatly below cost, for the express purpose of being able to show profits in operation so far as the new corporation was concerned.

I have cited but few of the great multitude of cases which have dealt with this general subject. None has been found just like this. The one principally relied on by the defendant is Squier v. Commissioner, 68 F.(2d) 25 (C.C.A.2). I cannot be sure that the conclusion reached here is entirely compatible with that decision. The court there seems to lay little stress on the necessity of a definitely identifiable event, which the same court does recognize in other decisions. For example, Benjamin v. Commissioner (C.C.A.) 70 F.(2d) 719. Other cases cited herein, and especially Gowen v. Commissioner, supra, justify the emphasis I place upon this element, which as to the years prior to 1929, I think is lacking. The Benjamin Case, supra, is also cited by defendant, but is clearly distinguishable from the case at bar because of the fact that there the company did not cease operations. It continued in order to make its venture a commercial success and the stock valuable, while here what little was nominally done was to aid liquidation. De Loss v. Commissioner (C.C.A.) 28 F.(2d) 803, 804, is also cited, but is distinguishable from our 1927 situation, for there the court says: "The shares were patently worthless and could never have any value. The trustees had declared that the creditors could never be paid in full; the business was at an end. * * * So far as human foresight could go, the shares were worthless, and the petitioner might have deducted the loss." The above quotation would apply to the condition of the Cuptor Corporation in 1929, but not before.

It seems that plaintiffs filed claims for refund for other years than 1929, as well as for that year. It also appears that at least two stockholders—Greist Manufacturing Company and Sholes, Inc.—deducted their investments in the stock on their returns for 1929, and the deductions were allowed.

I do not understand that either of these facts is of any special significance here.

The court concludes that plaintiffs are severally entitled to recover, and judgments will be rendered in their favor. In the Hanna Case this will include judgment for taxes on $3,095.33, which the defendant admits was incorrectly assessed.

Counsel for plaintiffs may prepare findings of fact in accordance with this opinion. The defendant's several motions for judgment are overruled, to which he is allowed his exceptions, and the record may show this action to have been taken at the hearing.